9 F.3d 792
 SNAKE RIVER FARMERS' ASSOCIATION, INC., Plaintiff-Appellee,
v.
DEPARTMENT OF LABOR; Lynn Martin, Secretary of Labor, U.S.
Department of Labor; G. Edward Leslie, Employment and
Training Administration; Ruth Kapetan, Certifying Officer,
U.S. Department of Labor; Richard Thornburg, Attorney
General of the United States; Immigration and
Naturalization Service, Defendants-Appellees,
v.
Louis NAPOLES; Manuel Ojeda; Filemon Ballesteros, Jr.,
Defendants-Intervenors-Appellants.
SNAKE RIVER FARMERS' ASSOCIATION, INC., Plaintiff-Appellee,
v.
DEPARTMENT OF LABOR, et al., Defendants,
and
Filemon Ballesteros, Jr., et al., Defendants-Intervenors-Appellants.
Alejandro NAGAY-JAIME; Margarito Bahena Plaintiffs-Appellants,
v.
DEPARTMENT OF LABOR, et al., Defendants,
and
Snake River Farmers' Association, Inc., Defendant-Intervenor-Appellee.
 Nos. 91-35885, 92-35074 & 92-35075.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 6, 1993.
Decided Nov. 9, 1993.
 
 Javier Riojas, Texas Rural Legal Aid, Inc., Eagle Pass, TX, for plaintiffs-appellants.
 Thomas E. Wilson, Christopher A. Weals, Seyfarth, Shaw, Fairweather & Geraldson, Washington, DC, for plaintiff-appellee.
 John S. Koppel, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.
 Barbara McDowell, Susan M. Green, Migrant Legal Action Program, Washington, DC, for defendants-intervenor-appellants.
 Before BOOCHEVER, DAVID R. THOMPSON, and KLEINFELD, Circuit Judges.
 Appeal from the United States District Court for the District of Idaho.
 KLEINFELD, Circuit Judge:
 
 
 1
 The district court properly dismissed this case for lack of standing. The appellantintervenors, farmworkers, lack an injury in fact likely to be redressed by a favorable decision. Two of them suffered no injury from the harm complained of, and the third seeks relief which would be of no benefit to himself. We therefore lack jurisdiction to consider the dispute on the merits.
 
 
 2
 I. Facts.
 
 
 3
 This case was started by the farmers, not the farmworkers. The Snake River Farmers' Association sued the Secretary of Labor to obtain changes in the terms upon which the Department of Labor allowed the farmers to employ foreign workers. For a portion of the year, the farmers employ hundreds of farmworkers to operate their irrigation systems. The government allows the farmers to bring foreign workers into the country if there are not sufficient domestic workers available, and the employment of the foreign workers will not adversely affect the wages and working conditions of similarly employed United States workers. 8 U.S.C. Sec. 1188(a) (1988).
 
 
 4
 To hire foreign workers, farmers must submit proposed wage schedules to the Department of Labor's Regional Administrator. The Regional Administrator certifies a minimum wage rate which must be paid "for a particular occupation and/or area ... so that the wages of similarly employed U.S. workers will not be adversely affected." 20 C.F.R. Sec. 655.100(b) (1992). Occupational qualifications proposed by employers are similarly reviewed and certified by the Regional Administrator. Id. Sec. 655.102(c). Basically, the Department of Labor puts a floor under wages so foreign workers will not depress the wages and working conditions of Americans. The farmers' employment offers to domestic and foreign farmworkers, termed "clearance orders" in the government's jargon, must be on terms at least as favorable to the workers as the Department of Labor minimums.
 
 
 5
 The Snake River Farmers' Association submitted several clearance orders with proposed wage schedules and job requirements to the Department of Labor's Regional Administrator for certification. The Regional Administrator approved the job qualification requirements, but rejected the wage proposals. In response, the farmers sued the government, claiming that the Department of Labor's requirements were arbitrary, and that the Administrator should have issued the certificates the farmers needed to get foreign workers into the country on the farmers' proposed terms.
 
 
 6
 The wage rates at issue were for irrigation workers in five counties in Idaho. The farmers' fields are irrigated by means of portable water lines, which the workers move from one location to another. The wage rate for irrigation work depends on various factors, including the size and type of the line a worker is assigned to move.
 
 
 7
 Wheel lines may be of any length, but have a motorized wheel to help move them. As the district judge explained,
 
 
 8
 A center-move irrigation line has a motor at the center of the line which requires the worker to enter the field to operate the motor. An end-move irrigation line allows the worker to attach a portable motor to the end of the wheel-line and thereby avoid the extra time it takes to enter the field.
 
 
 9
 Snake River Farmers' Ass'n v. United States Dep't of Labor, No. 9-0075, slip op. at 15, 1991 WL 539566 (D.Idaho Oct. 1, 1991). Difficulty varies with quality and age of the equipment, length of the line to be moved, and geography of the terrain.
 
 
 10
 Hand lines have diameters of three or four inches, and have no attached wheel to facilitate movement. Hand-line workers are normally assigned to work on a particular diameter of line, i.e., they are assigned to work on either four-inch or three-inch lines, but usually not both.
 
 
 11
 The farmers proposed wage rates that varied depending on the type of line and the county in which the work was to be done. They sought lower rates for flat counties than for hilly counties. They also proposed qualifications that would require twenty days of irrigation-line experience, attested to by one reference. A farmworker who could not meet the twenty-day experience requirement was to be an "apprentice irrigator" at a lower wage rate for the first twenty days of employment. The Department of Labor disagreed with parts of the farmers' proposed wage schedule, and imposed one with less variation in pay for geographical and line-type differences than the farmers thought reflective of the market.
 
 
 12
 The farmers sought judicial review of the Department of Labor's wage-rate determinations. United States workers Alejandro Nagay-Jaime, Margarito Bahena, and Filemon Ballesteros, Jr. intervened and sued separately in an action consolidated with the farmers' lawsuit. The workers asserted that the wage schedules proposed by both the farmers and the Department of Labor were violative of the applicable legal standards, and that the Department of Labor should not have approved the farmers' experience requirement. The workers attempted to convert the case into a class action, but the district court denied certification. The three appealing intervenors do not appeal denial of their proposed farmworker class certification.
 
 
 13
 The farmers and the workers filed cross-motions for summary judgment. The district court granted summary judgment in favor of the farmers, finding that the Department of Labor was arbitrary and capricious in rejecting the farmers' proposed wage schedule. It dismissed the workers' claims for lack of standing, and in the alternative, ruled against them on the merits. Both the Department of Labor and the workers appealed, but the Department of Labor later dismissed its appeal. Therefore, only the workers' claims are before this court for review.
 
 
 14
 II. Analysis.
 
 
 15
 Because we affirm the district court's decision on the ground that the appellants lacked standing, we do not reach the other issues raised on appeal. We do not decide the merits of the wage schedule. Standing is a question of law reviewed de novo. United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Insurance Corp. of Am., 919 F.2d 1398, 1399 (9th Cir.1990).
 
 
 16
 Federal courts require standing because federal "judicial Power" is limited to "cases" and "Controversies." See U.S. Const. art. III, Sec. 2; Allen v. Wright, 468 U.S. 737, 750-51, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984). The federal courts lack power to make a decision unless the plaintiff has suffered an injury in fact, traceable to the challenged action, and likely to be redressed by a favorable decision.
 
 
 17
 [T]he irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
 
 
 18
 Lujan v. Defenders of Wildlife, --- U.S. ----, ----, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (alterations in original) (citations omitted); see also Fernandez v. Brock, 840 F.2d 622, 625 (9th Cir.1988) (reciting same requirements for standing).
 
 
 19
 A defendant's violation of a statutory duty is not enough--the judiciary lacks power to correct the executive branch on the petition of one who is without an injury in fact that is fairly traceable to the executive action and likely to be redressed by the requested relief. See Fernandez, 840 F.2d at 625; Madsen v. Boise State, 976 F.2d 1219, 1221-22 (9th Cir.1992). The party invoking federal jurisdiction bears the burden of establishing standing, and in response to a summary judgment motion must provide cognizable evidence of specific facts, not mere allegations. Lujan, --- U.S. at ----, 112 S.Ct. at 2137.
 
 
 20
 The district court correctly concluded that the three appellants lacked standing. Each of the three appellants lacks at least one critical element of standing, although the elements lacking vary between plaintiffs.
 
 
 21
 Ballesteros challenges the wage rates for wheel-line and four-inch hand-line moves in two counties. However, he has never moved the kinds of lines for which he puts the wage rates at issue; nor do his proofs establish that he has worked or will work in either county. In 1988, 1989, and 1990, his primary work consisted of weeding and thinning beet fields. At some uncertain past time, Ballesteros performed some irrigation work, but he could not recall for whom or where. His irrigation work did not involve wheel lines. Regarding the 1990 season preceding the lawsuit, Ballesteros confessed that "I don't have any problems [with the Snake River Farmers' Association] because I didn't work for them."
 
 
 22
 During 1991, the year the lawsuit was filed, Ballesteros did some irrigation work, but it consisted of moving three-inch hand lines, not wheel lines or four-inch hand lines. He did not work in the counties for which he challenged the rates. The farmer for whom he worked became dissatisfied with his performance, took him off irrigation work, and put him back on beet field hoeing, after which Ballesteros quit. Ballesteros testified in his deposition that he thought the lawsuit was to raise the wages for three-inch hand lines where he worked, but the complaint did not seek that relief.
 
 
 23
 Ballesteros argues that he could have been transferred to or hired in the counties at issue or for the work at issue at some future time, and that lower pay for different work in different places might have affected his pay. The possibility that Ballesteros might obtain work of the kinds at issue is a "some day intention" which, as Lujan holds, lacks the concreteness of an actual or imminent injury. Lujan, --- U.S. at ---- - ----, 112 S.Ct. at 2138-39. Ballesteros theorizes that low wage rates in one place for one kind of work might affect another kind of work in another place. So speculative, attenuated, and general an effect meets none of the three Lujan elements.
 
 
 24
 Nagay-Jaime challenges the hiring requirement for the higher pay level of twenty days experience, which must be attested to by a reference. But he had the requisite experience and could furnish the reference. The requirement could not be an "injury in fact" to him.
 
 
 25
 The affidavit Nagay-Jaime signed says there was a twelve day delay between his application for work March 7, 1990, and his job offer (he ultimately worked in Oregon rather than for the Idaho farmer to whom Job Service referred him). His attorneys argue that the twelve day delay was an injury in fact sufficient for standing. But neither the affidavit nor the other evidence shows that the delay was caused by the experience and reference requirement, rather than some other reason, such as administrative delay in processing the papers, or a delay between when he applied and when a farmer requested workers, or a late spring. The affidavit does not say why the job offer came twelve days after the application. Nor has Nagay-Jaime offered any evidence why he could not apply while he was still on his previous job, leaving a cushion of a couple of weeks before he needed the Snake River job, if a delay could be anticipated. The standing requirements articulated in Lujan
 
 
 26
 are not merely pleading requirements but rather an indispensable part of the plaintiff's case, [and] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation.
 
 
 27
 Lujan, --- U.S. at ----, 112 S.Ct. at 2136. "In response to a summary judgment motion ... the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken as true." Id. at ----, at 2137 (citation omitted).
 
 
 28
 Nagay-Jaime testified in his deposition that he received a "placement letter" March 13, 1990[1] for employment with a farmer named Clements. He testified that "it wasn't the irrigation season yet. It was the apple season.... I was supposed to be working with Clements from April 3rd on." If "it wasn't the irrigation season yet" when he got his job offer, then the delay between the application and the job offer could not have caused injury in fact to Nagay-Jaime. These facts do not imply that the experience and reference requirement caused the delay. These facts imply that Clements' offer was delayed because the irrigation season had not yet started. Even if Clements had responded the day Nagay-Jaime applied, he would not have needed him until the irrigation season began in April. Nagay-Jaime did not show facts to establish that he met the "fairly traceable" element of standing. "[T]he irreducible constitutional minimum of standing contains three elements: ... Second, ... the injury has to be 'fairly ... trace[able] to the challenged action of the defendant.' " Lujan v. Defenders of Wildlife, --- U.S. ----, ----, 112 S.Ct. 2130, 2136 (1992).
 
 
 29
 Nagay-Jaime also lacks injury from the wheel-line rate of pay that he challenges because he had no experience moving wheel lines and no imminent expectation of a wheel-line job. He lacked injury in fact from the wage rate for moving hand lines, and the productivity standard of 44 to 48 sections of hand line moved per hour, because he had worked for a farmer in Oregon for the last several years, not Idaho, and continued working for the Oregon farmer through the period of the lawsuit. He did not work for a Snake River Farmers Association farmer.
 
 
 30
 Nagay-Jaime testified that he did not know how much the Snake River Farmers' Association was paying for moving three- and four-inch hand lines, the subject of his lawsuit. In fact, the pay was a little higher than what he was getting in Oregon. He was suing farmers for whom he did not work, claiming that the pay was too low for a type of work he did not do, and the farmers he sued were paying a higher rate than what he got. Nagay-Jaime's affidavit states that he is "still interested in working for [Snake River Farmers' Association] members" and that he went to the Payette County Job Service office in 1991 in case he might get an Idaho job with family housing. But he had not had one before, and the possibility that he might seek and obtain Snake River employment, instead of going back to Oregon as he had every year before, was insufficiently concrete to make his injury from Snake River pay and conditions "actual or imminent." Id. at ----, ---- - ----, at 2136, 2138-39. He had not been injured before by the Snake River requirements, and it was highly speculative that he would be injured in the future.
 
 
 31
 To the extent that Bahena's evidence shows that he was denied the higher wage position as an irrigator because of the experience requirement, he has suffered an injury. Yet even if we assume that an irrigator position was available when Bahena applied, or that he would have accepted an irrigator job whenever it became available, Bahena has not sued for damages to recover the money he might have made as an irrigator if the experience requirement had not limited his employability in the position. Bahena said in his affidavit that he sought to apply for an irrigator position with the Snake River Farmers' Association, but the Job Service representative told him that he could not qualify without twenty days experience and a reference. He had only six days experience as an irrigator, which he accumulated during a general farm work job. The representative told him he could apply for an apprentice irrigator position, at $4.25 per hour instead of the $4.79 an irrigator would be paid, and his pay would be increased to $4.79 once he had worked twenty days. He applied for the apprentice irrigator position and also a firefighter position. He received a job offer to be an apprentice irrigator about six weeks after he applied, but rejected it because by then he had accepted the firefighter position.
 
 
 32
 Bahena's evidence does not demonstrate that he suffered any injury because of the experience requirement. Had Bahena accepted the apprentice irrigator offer, he might have standing to challenge the pay differential on the ground that the experience requirement was improper, and had cost him money. But since he turned down the offer, he did not suffer the loss.
 
 
 33
 Furthermore, Bahena has not sued for damages to recover the money he might have made as an irrigator if the experience requirement had not limited his employability in that position. He has sued only for an injunction, without establishing that he will suffer harm if the injunction is denied, or benefit if it is granted. " '[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " Lujan, --- U.S. at ----, 112 S.Ct. at 2138 (alteration in original) (citations omitted).
 
 
 34
 Bahena does not claim ever to have worked as an irrigator for a Snake River farmer. He does not claim ever to have worked on a Snake River farm. The closest he comes to establishing a likelihood of harm if the Snake River farmers underpay their irrigators is the statement in his affidavit that "I will be looking for seasonal agricultural opportunities in the future. I am still interested in future employment as an irrigator with SRFA members." This is the kind of "some day" speculative possibility which Lujan holds cannot establish standing. "Such 'some day' intentions--without any description of concrete plans, or indeed even any specification of when the some day will be--do not support a finding of the 'actual or imminent' injury that our cases require." Lujan, --- U.S. at ----, 112 S.Ct. at 2138.
 
 
 35
 The farmworkers and the farmers would both like us to decide the case in such a way as to result in particular rules for wages and qualifications of Idaho irrigation workers. We oblige neither of them because of our determination that we lack the power to rule on the substantive questions. Standing doctrine limits judicial power. Perhaps we might have something useful to say about how much Idaho farmworkers should be paid, for which work, in which counties, and how much experience they should have, but "[w]e should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch." United States v. Richardson, 418 U.S. 166, 188, 94 S.Ct. 2940, 2952, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).
 
 
 36
 It is interesting that Ballesteros thought the lawsuit sought higher wages for people like him, when it did not, Nagay-Jaime challenged an experience requirement which he met, and Bahena's claim sought only an injunction, which would not benefit him. Perhaps they thought their lawyers were doing something for them in particular. They were not. No doubt their lawyers planned the lawsuit to accomplish generalized social impact that the lawyers earnestly believed would be desirable for migrant workers. But the relief would not benefit their clients, Ballesteros, Nagay-Jaime, and Bahena. The constitutional doctrine of standing requires us to ask such questions as: "Was this person hurt by the claimed wrongs?" and "Can victory in this lawsuit give this individual any relief?" These three individuals were not hurt by the claimed wrongs, or could not benefit from the relief sought, or both.
 
 
 37
 We readily vindicate the legal rights of those who do the hard work of migratory farm laborers. E.g., Martinez v. Shinn, 992 F.2d 997 (9th Cir.1993). But regardless of what views we may have on farm and labor policy, our commissions limit our powers to those of judicial officers. The kind of policy-oriented lawsuit sometimes called "impact litigation," designed to change social policy rather than to vindicate legal rights of a particular plaintiff, may beckon from beyond our grasp, as it does in this case. We can do nothing in this lawsuit which would redress harm or prevent injury to Ballesteros, Nagay-Jaime, or Bahena, so we can do nothing at all.
 
 
 38
 AFFIRMED.
 
 BOOCHEVER, Circuit Judge, dissenting in part:
 
 39
 I agree with the majority that Bahena and Ballesteros lack standing. But because I believe Nagay-Jaime has shown an injury in fact traceable to the challenged wage rates and experience-reference requirements, and because his injury would be redressed by the injunctive and declaratory relief he requests, I would reverse the district court's determination that Nagay-Jaime lacks standing.
 
 
 40
 Nagay-Jaime applied for irrigation work in Idaho with the SRFA on March 7, 1990, furnished the required reference, and encountered a twelve-day delay in receiving a job referral. He eventually was referred to an SRFA employer for an irrigation job to begin April 3, 1990, although other farmers had requested irrigation workers for an earlier date.[1] For reasons unrelated to this lawsuit, the grower denied him the job. Nagay-Jaime testified at his June 1991 deposition that he applied to the SRFA for irrigation work in Idaho again in May 1991 and was not hired. He stated in a subsequent June affidavit that he continues to do irrigation work and remains interested in working for SRFA members.
 
 
 41
 As a worker who has twice applied for irrigation jobs with the SRFA and who continues to want to work for the SRFA, Nagay-Jaime has established a prima facie case of injury by the cumbersome requirements of experience and reference. Although he satisfied those requirements, he alleges that they injured him by causing unreasonable delays. As one genuinely seeking employment, he has standing to challenge the productivity requirements, which affect the work he seeks, and the wage rates, which he claims are too low. His injury is far more "actual and imminent" than that of the individual plaintiffs in Lujan v. Defenders of Wildlife, --- U.S. ----, 112 S.Ct. 2130 (1992). The Lujan plaintiffs merely expressed their intent to return eventually to the areas affected by the challenged environmental policy, a possibility the Court found mere " 'some day' intentions." Id. at ----, at 2138. There is no similar lack of specificity in Nagay-Jaime's claims of injury. Not only has Nagay-Jaime alleged he has been affected by the experience and reference requirements applied to him in the past, but those requirements, the productivity standards, and the low wage rates, affect the availability, quality, and wages of the jobs he now continues to seek in his chosen area of employment.
 
 
 42
 Nagay-Jaime also seeks relief that would redress his injury. The declaratory and injunctive relief he asks for would make the work he seeks easier to get and more attractive and lucrative once obtained.
 
 
 43
 In my view, Nagay-Jaime clearly has shown harm to his particular employment opportunities, opportunities which he has sworn he will exploit. In Lujan, the Supreme Court heightened the requirements for finding an injury in fact sufficient for Article III standing when a plaintiff complains of the government's unlawful failure to impose adequate regulations upon third parties. Lujan, --- U.S. ----, 112 S.Ct. at 2137. Under Lujan, however, standing is available if the plaintiff, rather than having a mere indefinite intention of using the resource put at risk by the defendant at some unidentified time in the future, indicates specific plans to use that particular resource, and can count him or herself among the injured. Id. See Cass R. Sunstein, What's Standing After Lujan? Of Citizen Suits, 'Injuries,' and Article III, 91 Mich.L.Rev. 163, 224 (1992). Nagay-Jaime's continued attempts to find an irrigation job with the SRFA put him at a genuine risk of future injury from the requirements and wage rates about which he complains. Combined with his past injury, that risk establishes his standing.
 
 
 44
 I respectfully dissent.
 
 
 
 [1]
 Nagay-Jaime's testimony and affidavit are inconsistent as to whether he received Clements' placement letter on March 13, as he testified in his deposition, or March 19, which would be twelve days after he applied, as claimed in his affidavit. But whether the delay was six days or twelve does not affect the decision. Prior to the irrigation season, farmers indicated March 15 as their anticipated "date of need" for irrigation workers, but we have no evidence that farmers hired irrigation workers beginning on that date. Nagay-Jaime testified that the irrigation season did not in fact begin that spring until April, and it was still the apple season when he applied and when he got his job offer. We can only speculate about whether any other farmer might have had a use for irrigators prior to April, and whether that hypothetical farmer might have hired Nagay-Jaime earlier but for a need to check on his experience--there is no evidence for either proposition
 
 
 [1]
 SRFA members staggered their dates of need for irrigation workers, beginning March 15. In his affidavit, Nagay-Jaime states that when he applied to the SRFA in 1990 a date of need earlier than April 3, 1990 (the date his job was to start) was available. (The record indicates the dates of need for irrigation workers commenced on March 15 in the years 1989 and 1991. There is no specific reference to the commencing date in 1990, but it can be assumed to be the same.) Although Nagay-Jaime, when asked through an interpreter whether the irrigation season had begun before April 3, 1990, responded that he did not know, it is apparent from the earlier dates of need filed by other farmers that irrigation work commenced earlier